### CROWL et ux. v. BOX et ux.

No. 19280.   Opinion Filed April 15, 1930.

Rehearing Denied June 10, 1930.

26

Commissioners' Opinion, Division No. 2.

Andrews & Aston, for plaintiffs in error.

Monk & McSherry, for defendants in error.

BENNETT, C. The parties to this appeal are in the reverse order in which they appeared in trial court. They will be referred to as plaintiffs and defendants in the order of their appearance in said court.

Plaintiffs owned certain real estate in Oklahoma City and certain other real estate in Cleveland county, Okla. Defendants owned a certain chicken ranch near McAlester, Okla., stocked with poultry. After negotiating, said parties decided to make an exchange of said properties upon even terms, in evidence whereof they executed a written agreement providing that defendants should convey to plaintiffs the said chicken ranch containing 5½ acres, more or less, together with all the appurtenances thereon, including 1,600 laying hens and 1,700 young chickens, more or less, etc., free of incumbrance, and that plaintiffs should convey to defendants the said real estate in Oklahoma City and said certain tract of land in Cleveland county, all property described, free from incumbrance, except two mortgages in favor of Gum Brothers, the first for $5,167.50 on the Oklahoma City lot, the other for $1,200 on the Cleveland county farm. Taxes upon all said properties were to be paid up to and including the year 1923.

A copy of this contract is made part of plaintiffs' petition. Such petition alleges that plaintiffs had performed all conditions of, and had made all transfers required by, said contract; that defendants had not complied with said contract in that they had delivered to plaintiffs only 1,100 hens and 1,200 young chickens instead of the numbers called for; that defendant W. S. Crowl assured plaintiffs that the number of birds called for in said agreement was actually on the ranch; that they had been recently counted; but that said representations were knowingly false and made with the intention of having plaintiffs rely upon same, and that plaintiffs did actually rely thereon in consummating the exchange of properties, and that, by reason of defendants' failure to convey the number of chickens agreed upon, plaintiffs were damaged in the sum of $750. Plaintiffs, by subsequent amendment, also asked recovery of certain taxes paid which defendants were obligated to pay.

The defendants, after having unsuccessfully demurred to the petition, filed for answer a general denial; disclaimed knowledge of, or statements as to, the number of chickens then on the ranch; and alleged

that plaintiffs knew that the ranch had been in the control of one John McAlpine, whose estimate as to the number of fowls was accepted; that plaintiffs had knowledge of the property, the number of chickens, etc., on said premises; that his son had been on the premises and had opportunities to ascertain just what fowls were there; that defendants and plaintiffs discussed that portion of the contract providing for the transfer of 1,600 laying hens and 1,700 young chickens, more or less, and that the term "more or less" meant literally what it said; that the chickens were delivered upon that understanding of its terms; that such understanding was oral and was accepted as an interpretation of and acted upon by all parties.

Defendants also set up cross-petition for certain taxes paid and for the balance of an unreleased mortgage covering part of said property, for all of which defendants ask affirmative judgment against plaintiffs.

The case was tried to a jury, and from a verdict and judgment in favor of plaintiffs for $427.80, defendants appeal.

Defendants in their brief present together assignments of error numbered 1, 3, 4, 7, and 10, with respect to which defendants say in their brief:

"These specifications of error each go to the sufficiency of the petition as well as to the evidence to recover on the first cause of action (C.-M. 48) against Mrs. Nannie Crowl."

Defendants first stress the point that this was a mere exchange of property and involved no money consideration. This is apparent, of course, from the contract, as well as from the evidence, but certainly there is nothing in the written contract (which, it seems, the defendants prepared) which tends to indicate that the plaintiffs were to buy a "pig in a poke." If the plain letter and meaning of that contract is to be accepted, giving to words their ordinary interpretation, the plaintiffs were to receive, in addition to the real estate, 3,300 chickens. These questions were asked W. S. Crowl:

"Q. Now, what did you say to Mr. Box about how many chickens were on the place as you believed and as you thought were there? A. Sixteen hundred hens and seventeen hundred young stuff. * * * The Court: Q. Find out when was this first conversation, when was this conversation you had with him in which you told him how many chickens? A. When we first commenced to make the trade, sometime in May, on up several times, on up until it was consummated."

This witness, in his evidence, treats the

20th of June as the date of consummation. Plaintiffs' evidence is all to the effect that they were trading because they were getting the number of chickens called for in the contract, and that when the shortage developed they stopped negotiations until the defendant W. S. Crowl assured them that the shortage was made good. It is urged that Corbin Box, son of Patrick Box, went over to take immediate charge. All of plaintiffs' testimony is to the effect that he went primarily to learn how to run the business, and also to make a count of the stock on hand. Having done this and reported to his father, his father met W. S. Crowl at McAlester, but took no steps to close the contract, left for home, and, according to the evidence of himself and wife, refused to go further until they were assured by W. S. Crowl that the shortage had been made good and the contract complied with.

The argument of defendants seems to be that the poultry was appurtenant to the ranch, and since the ranch was accepted, necessarily the poultry should follow. The poultry was a separate item and was in no sense appurtenant to the land and would not have passed by a deed covering the real estate.

It is next contended that, because the preliminary count of the poultry showed that there was a shortage, it was plaintiffs' duty immediately to stop negotiations upon pain of being held to have accepted just what was there instead of just what ought to have been there. We know of no reason why the defendants should not have been allowed to make good the shortage, nor can we conceive of any advantage to be reaped by W. S. Crowl, or those for whom he acted, by falsely representing that the shortage had been made good. It is true that these facts are alleged in the petition, but we are unable to see how that could cause the same to be demurrable. Defendants should not occupy the position of receiving an advantage from plaintiffs' reliance upon their false statement that the shortage had been made good.

It is next contended that if any misrepresentations were made, there is no evidence that Mrs. Nannie Crowl had knowledge thereof or was bound thereby. From an inspection of the entire record, it is very clear that the wives of these two men, who were in the forefront of the negotiations were advised almost every step therein. The exchange contract was signed by W. S. and Nannie Crowl, by Patrick J. and Emma Box. During the negotiations in Oklahoma

City, the wives seem to have been present most, if not all, the time, and to have heard the various conversations between their husbands. Mrs. Crowl testified at considerable length about the facts leading up to the contract of exchange and concerning the chickens on hand at and immediately before the transfer. She was a party to the suit; she had lived on the chicken ranch, and had been interested therein from the start. Counsel for defendants assumes in his opening statement that she knew more about the ranch than did her husband, and it may be fairly inferred from the evidence that she had, for a long time, rather full control over the ranch. The contract of exchange designates the ranch as "now belonging to said W. S. Crowl and wife."

Section 5062, C. O. S. 1921, is as follows:

"Where all the parties who unite in a promise receive some benefit from the consideration, whether past or present, their promise is presumed to be joint and several."

Section 5013, C. O. S. 1921, is as follows:

"A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known, or ought to be known, to the person accepting."

If the testimony of plaintiffs is true, and, under the evidence, the jury has so found, then, the oral representations of defendants, as well as the representations in the written contract of exchange, under our interpretation of the same here, were false, and such wrong gave right of action to plaintiffs for the consequent loss, due to their reliance, in good faith, upon such statements. It clearly appears that Mrs. Crowl had more accurate knowledge as to the number of chickens, with reference to which the jury has found a misrepresentation, than her husband had. It is worth noting too that the warranty deeds executed by plaintiffs were made directly to W. S. Crowl and Nannie Crowl, husband and wife. So that we find no substantial ground for the defendants' contention either that the petition did not state a cause of action, or that the evidence was insufficient as against Mrs. Nannie Crowl.

It is also contended by defendants that since the petition alleges that defendant W. S. Crowl stated that the number of chickens called for by the exchange contract was on the premises, and that he had just counted them, and since plaintiff, Patrick J. Box, testified that Crowl did not tell him that he had just counted them, the allegation of misrepresentation falls, and there is a variance between the allegations and the proof. It seems to us that the statement in the exchange contract and orally made by said defendant as to the number of chickens is not affected by the allegation in the petition that he had just counted them. It could be only surplusage and when taken in connection with proof by W. S. Crowl himself that he relied on the counting of McAlpine as to the number of chickens, the basis for the contention passes out of the case. This defendant could not know the number of chickens, unless he counted, or had another count, them, and certainly it would be quibbling to argue that there was a substantial difference between the allegations and the proof in this case as to that matter.

We are referred to sections 262 and 265, C. O. S. 1921, and to various cases holding to the general effect that a petition must state the facts constituting the cause of action, and that the proof must conform to the pleading, and that where fraud is alleged, the facts must be sufficiently set forth in order that the court may determine the sufficiency of such acts to constitute fraud. These cases do not hold that a litigant must prove everything that he alleges. If the allegations are broader than the proof, no harm is done if the proof is sufficient and within the allegations. The cognate rule is equally well settled that if the allegations are narrower than the proof, which is admitted without objection, the pleadings will be treated as having been amended so as to conform. These are just ordinary practical rules adopted for the administration of justice and to prevent strangling the right of a litigant by technical construction. It appears clear in this case just what misrepresentation was made the basis of plaintiffs' right to recover. Conceivably Mr. Crowl is insolvent and his wife abundantly solvent. With her knowledge of the facts as disclosed by this evidence, including her own testimony and with the record clear that she not only was active in bringing about this exchange, but actually took a conveyance of one-half interest in the property transferred by plaintiffs, it would be strange indeed to say that she could not be held, because, in fact, she did not make an untrue oral declaration as to the number of chickens on the ranch.

It was also contended that the court erred in allowing plaintiffs to testify with reference to the payment of certain taxes under an executed oral agreement made, after the exchange of deeds, to the effect that, since the taxes on the properties ex-

changed would be about equal, each former owner should pay taxes on the property which he had conveyed. That might have been objectionable, but it seems no proper objection was made to it. Each party went into the matter; the plaintiffs through their witness testified that such an arrangement was made, and Mr. W. S. Crowl, while uncertain about the arrangement, did not deny it. We might say at this stage of the trial, the parties plaintiff and defendant took the bridle off and proved about whatever they chose. We have gone carefully over all the evidence and are convinced that no prejudice has been suffered by defendants in that behalf.

Defendants next contend that the court erred in refusing to give defendants' requested instructions numbered 1, 2, 3, 4, 5, 6, 7-A, and 8. Number 1 is a peremptory instruction requested for defendants. The defendants were not entitled to this instruction under our holding. Number 2 is a similar instruction as to Mrs. Nannie Crowl. That has been discussed. No. 3 is to the effect that if the plaintiffs had an opportunity to inspect the property, and thereafter consummated the deal, it was an acceptance of the property as it then existed, and they could not recover even if there were not as many chickens on the property as they thought. This was preceded by the statement that "by the contract of the parties hereto there was contemplated an exchange of property as it then existed." This is not a correct statement of the law under the facts of this case. No. 4 violates the plain rule of construction of our courts with reference to the interpretation of the words "more or less," where the same are preceded by a designated number of articles. No. 5 is intended to cover a principle which was fully covered by instruction No. 8 of the court. No. 6 was not correct because it invaded the province of the jury. The same statement might be made with reference to Nos. 7. 7-A and 8. It is sufficient to say that we have examined carefully all these requested instructions, and that their refusal furnishes no ground for reversal.

We think a brief, partial statement of plaintiffs' evidence may be proper: On June 13, 1924, the plaintiffs executed (but testified they did not deliver) their deeds to the Oklahoma City and Cleveland county property called for by the exchange contract, and about a week later, Corbin Box, a son of Patrick Box, went to McAlester to learn how to operate the ranch and to check the chickens before closing the deal, and on the following day he and defendants' agent made an actual count of the chickens and found there only 1,030 old and 1,262 young chickens (instead of 1,600 old and 1,700 young as called for in the contract). Corbin made immediate report thereof to his father at Oklahoma City by letter. The elder Box called W. S. Crowl and informed him of the count and the shortage of over 1,000 chickens. Crowl said that he would go down to McAlester the next day, and both parties met there at such time, but Crowl was having a heated argument with John McAlpine (who was interested in the chickens) over their own settlement. Box did not remain, but told Crowl that when they completed their settlement, and when the shortage in chickens was made good, that the deal could go through, otherwise not. Mr. Box testified that he saw Mr. Crowl at Oklahoma City on the next Monday or Tuesday at which time he informed plaintiff that he had straightened up the business at McAlester, had settled with McAlpine, that he had bought and put in sufficient fowls to make good the shortage, and upon the strength of this statement, the deal was closed.

Mr. McAlpine testified that when Mr. Crowl came down he (McAlpine) told Crowl that everything was all right, that they had counted the chickens, and that Crowl became violent and abusive because the chickens had been counted. McAlpine said that he was interested to the extent of 50 per cent. in a part of the chickens under a contract with Crowl. Plaintiff Box testified in answer to a question with reference to how the shortage was arranged with Mr. McAlpine as follows:

"I says, 'Mr. Crowl, how did you, and Mr. McAlpine make it'; he says, 'Just fine.' I says, 'What did you do about the shortage?' 'Well,' he says, 'Mr. McAlpine come out in my debt $690, and had 500 pullets that he agreed to put in and he put them in.' 'Well,' I says, 'Mr. Crowl, that is all right doesn't take pullets long to make hens, that is all right with me, what about the fryers?' He says, 'They are all made up, John had enough there to make them up, and it is all made up.' Q. He gave you to understand the full amount was there? A. And the only thing was settlement."

He further testified that he made the deal with that understanding. Substantially the same evidence is given by Mrs. Box. McAlpine testified that he never made any count or estimate of the poultry during May or June to or for Mr. Crowl, and that a correct count of the poultry about June 19th

or 20th showed 1,030 grown chickens and 1,262 young chickens.

A letter under date of September 8, 1924, from W. S. Crowl, addressed to the attorneys for the plaintiffs, was introduced, in which, among other things, it is stated:

"I have your letter of September 2 in regard to the trade I made with Mr. Box; note what you say in regard to there being some thousand chickens short of the contract I made with Mr. Box, and in reply I will ask you to please examine that contract very closely. You will find that the contract states so many chickens, more or less. Now, if there was just one chicken on that place, the contract would be filled; however, Mr. Box went over there and accepted the chickens and the place before turning over his deeds to me, and he knew just how many chickens there were on the place when he turned the deeds over to me and accepted my deed. This contract was made before the deeds were made and was just simply a contract to hold good until we made out our deeds, and when the deeds were made out, the contract ceased to exist. * * *"

There was abundant testimony on the part of plaintiffs to the effect that they relied upon the statements of Crowl as being correct, and did not discover that the shortage had not been made good until they moved over to McAlester some time later.

There was contention by defendants that part of a certain written statement attached to the contract of exchange was not in the handwriting of defendant W. S. Crowl, and asking that the original document be certified here for our examination. This, of course, could be done by this court, but Patrick J. Box testified that he saw these items written by defendant W. S. Crowl. That proof was for the jury. If appellant wished the benefit of our examination of the original document, it should have been attached to the case-made, but if it were here, we could not properly pass upon the issue of fact thus presented.

The defendants assail general instruction No. 8. We have examined this along with the other charges of the court, and it is sufficient to say that there appears no instruction therein to the jury of which defendants may justly complain. In that instruction the court deals with the words "more or less."

In the case of Shickle v. Chouteau, Harrison & Valle Iron Co., 10 Mo. App. 241, 245, citing Patterson v. Judd, 27 Mo. 563, 567, the words "more or less," as used in a contract for the purchase of 400 tons of iron, more or less, are discussed. The court, in substance, says that the words "400 tons," in the contract, are to be taken not as mere words of expectation, but as words of contract, limiting and defining the quantity to be sold; to construe the contract as ambiguous would be to erase, in effect, from the contract, the words "400 tons." The words "more or less" would ordinarily cover a small excess or deficiency, proportioned to the amount named. The term "more" would not compel the party to take an indefinite quantity, nor would the term "less" force him to take a quantity bearing no proportion to that stipulated. This seems to be the general rule. See Cabot v. Winsor, 83 Mass. (1 Allen) 546, 550, and many other authorities set out in vol. 5, Words & Phrases (First Series) pp. 4582 and 4594.

Defendants brought out on cross-examination of Mr. Box that he did not simply buy all the poultry on the place, for he did not know what was on the place, but that he bought the number of chickens called for in the contract. Much more evidence of a similar character was brought out by their cross-examination of Mr. Box on the question of the term "more or less" in the contract.

In the case of Hills v. Edmund-Peycke Co., 14 Cal. A. 32, 110 Pac. 1088, the court clearly indicates that, where the words "more or less" follow a designated number of articles, the same provide only against accidental variances arising from slight or unimportant excesses or deficiencies, and citing Brawley v. U. S., 96 U. S. 168, 24 L. Ed. 622, and says further:

"The rule is also that parol evidence is inadmissible to show that the parties intended otherwise than the words indicate."

See, also, Santa Paula Commercial Co. v. Parkhurst-Davis Merc. Co., 86 Kan. 328, 120 Pac. 347; also Elliott on Contracts, vol. 1, sec. 185. The evidence introduced (whether rightfully or otherwise) as to the interpretation of the words "more or less" makes the verdict of the jury conclusive upon this phase of the matter after their finding.

Defendants' counsel exhaustively argues that this is a tort action. It is true that there were allegations of misrepresentation, but in this particular case they were more or less incidental, and simply offered as inducive of the contract which was finally concluded, evidenced by a written instrument in which the identical statements as to the number of articles to be delivered were set out in plain terms. It has been

held over and over again that where one is induced by misrepresentations to purchase, sell, or exchange property, he has a choice of remedies: one of which is that he may retain the property and sue for his damage, the measure of which is the difference between the value of the article sold, bought or exchanged, and what it should have been if as represented. In this case, the number of articles, under our holding, is measurably fixed; the amount of the shortage is hardly questioned. If there was some slight difference in the quality of proof required, it ought not to cause a reversal here, where the facts are almost without dispute, and where the recovery has been based and no doubt found upon the failure of defendants to deliver what they had agreed to deliver by their written contract. It therefore would seem to be needless to argue here the technical differences claimed by the defendants, for certainly on this appeal no harm appears to have come to defendants.

This doctrine is supported by Holcomb & Hoke Mfg. Co. v. Jones, 102 Okla. 175, 228 Pac. 968; Howe v. Martin, 23 Okla. 561, 102 Pac. 128; Werline v. Aldred, 57 Okla. 391, 157 Pac. 305; Bigelow on Fraud, vol. 1, p. 523; Pom. Eq. Jur. 896; Bank of Woodland v. Hiatt, 58 Cal. 234; Byers v. Brisley, 81 Okla. 215, 198 Pac. 90; Martinson v. Hamil, 132 Okla. 70, 269 Pac. 255; Stevens v. Reilly, 56 Okla. 455, 156 Pac. 157; Rogers v. Brummett, 92 Okla. 216, 220 Pac. 362; Jeter v. DeGraff, 93 Okla. 76, 219 Pac. 345.

We have gone over with care this entire record and evidence. It appears that the case has been tried with much skill and diligence, but we think the record singularly free from any outstanding error which would warrant reversal. Wherefore, we hold that the judgment of the trial court should be affirmed.

TEEHEE, EAGLETON, DIFFENDAFFER, and HERR, Commissioners, concur.

By the Court: It is so ordered.